IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-724

 Filed: 2 February 2016

Buncombe County, Nos. 14 JA 149–50

IN THE MATTER OF: C.B. & S.B.

 Appeal by Respondent-Mother from orders entered 13 February and

26 March 2015 by Judge Andrea F. Dray in District Court, Buncombe County. Heard

in the Court of Appeals 29 December 2015.

 John C. Adams, for petitioner-appellee Buncombe County Department of Social
 Services.

 Armstrong & Armstrong Law, by Amanda Armstrong, for guardian ad litem.

 Rebekah W. Davis for respondent-appellant Mother.

 McGEE, Chief Judge.

 Appeal by Respondent-Mother (“Mother”) from adjudication and disposition

orders, adjudicating C.B. neglected and S.B. neglected and dependent, and continuing

custody of S.B. with DSS. We affirm.

 I. Procedural Background

 C.B. and S.B. are twin sisters and were ten years old when the Buncombe

County Department of Social Services (“DSS”) filed the juvenile petitions in the

present case. The petitions alleged that C.B. was a neglected juvenile and that S.B.

was a neglected and dependent juvenile. The trial court entered an order awarding
 IN RE: C.B. & S.B.

 Opinion of the Court

nonsecure custody of S.B. to DSS on 27 May 2014. The trial court held an

adjudication hearing (“the hearing”) on 18 December 2014 and entered orders on

13 February 2015 adjudicating C.B. as a neglected juvenile and S.B. as a neglected

and dependent juvenile. The trial court held a disposition hearing on

12 February 2015 and entered orders on 26 March 2015 continuing custody of C.B.

with her mother under the supervision of DSS and continuing custody of S.B. with

DSS. Mother appeals.

 II. Factual Challenges

 A. Standard of Review

 Appellate review of an adjudication order is limited to determining “(1)

whether the findings of fact are supported by clear and convincing evidence, and (2)

whether the legal conclusions are supported by the findings of fact.” In re Pittman,

149 N.C. App. 756, 763–64, 561 S.E.2d 560, 566 (2002) (citation and quotation marks

omitted). If the appellate court makes these determinations in the affirmative, it

must uphold the trial court's decision, “even where some evidence supports contrary

findings.” Id. at 764, 561 S.E.2d at 566. “It is not the role of this Court to substitute

its judgment for that of the trial court.” Scott v. Scott, 157 N.C. App. 382, 388, 579

S.E.2d 431, 435 (2003). Unchallenged findings are binding on appeal. In re C.B., 180

N.C. App. 221, 223, 636 S.E.2d 336, 337 (2006), aff'd, 361 N.C. 345, 643 S.E.2d 587

(2007). Moreover, “erroneous findings unnecessary to the determination do not

constitute reversible error” where an adjudication is supported by sufficient

 -2-
 IN RE: C.B. & S.B.

 Opinion of the Court

additional findings grounded in clear and convincing evidence. In re T.M., 180 N.C.

App. 539, 547, 638 S.E.2d 236, 240 (2006).

 B. Unchallenged Findings

 Mother brings numerous challenges to the findings of fact in the adjudication

orders as to C.B. and S.B. The following unchallenged findings of fact are pertinent

to an understanding of Mother’s arguments on appeal: 1

 13. On [15 March] 2014, [DSS] received a report that
 alleged the following: that [Mother] slaps [S.B.] and
 calls her degrading names. The report further alleged
 that [S.B.] has extreme behavior problems, including
 punching herself.

 ...

 15. The report was screened in and assigned to social
 worker . . . Amanda Wallace [(“Ms. Wallace”)].

 ...

 18. [Ms.] Wallace testified that [S.B.] had been
 hospitalized at Copestone [psychiatric hospital] on
 five (5) occasions, as specified below. [S.B.’s] therapist
 recommended intensive in-home services for [S.B.],
 upon discharge. [Mother] was aware of this
 recommendation but did not comply. [Mother] felt
 that [S.B.’s] issues could be handled at home and that
 all [S.B.] needed was “someone to talk to”. On
 [17 March] 2014, [Mother] told [Ms.] Wallace that she
 had cancelled an appointment with Access Family
 Services, for an assessment for outpatient services for
 [S.B.], because she “didn’t get a good vibe” from her
 conversation with the provider. [Mother] committed

 1 The findings of fact in each child’s order are virtually identical. All quoted findings herein
are taken from the adjudication order as to S.B.

 -3-
 IN RE: C.B. & S.B.

 Opinion of the Court

 to finding another provider for these services, but
 ultimately failed to do so.

19. After the initial interview with [Mother], [DSS]
 received a new report that alleged that [S.B.] had a
 “blow up” at a local Ingles and was admitted to
 Copestone for evaluation. She was released from
 Copestone on [9 April] 2014, only to be readmitted
 later that day, after she ran from her mother, climbed
 up a tree, and refused to come down. The Asheville
 City Fire Department and Asheville City Police,
 responded and plucked [S.B.] from the tree, at which
 point she assaulted an Asheville City Police Officer by
 biting that officer. [S.B.] is ten years old.

 ...

21. On [21 April] 2014, [S.B.] was discharged from
 Copestone. However, immediately after she was
 discharged, [S.B.] had another outburst. She
 assaulted school staff and locked herself in a closet at
 school. After she was extracted from the closet, she
 was readmitted into Copestone. During this incident,
 [S.B.] reported that [Mother] was forcing her to take
 the wrong medication while at school.

 ...

26. A treatment team meeting with the hospital staff and
 [social worker Craig] Flores [(“Mr. Flores”)] was
 scheduled for Monday, [19 May] 2014. The team was
 developing a plan for [S.B.] to be discharged from the
 hospital and was exploring a more appropriate
 placement for [S.B.’s] discharge. [Mother] was aware
 of this meeting and had agreed to attend. However,
 [Mother] later refused to attend that meeting. At that
 time the discharge plan for [S.B.] was that she was to
 be released to a Psychiatric Residential Treatment
 Facility (PRTF) upon her release from Copestone.

27. After the treatment team meeting, [Mr.] Flores went

 -4-
 IN RE: C.B. & S.B.

 Opinion of the Court

 to [Mother’s] home to see why she did not attend the
 meeting. [Mother] stated that she would not
 cooperate with the hospital or [DSS] to develop a
 discharge plan. [Mother] stated that [S.B.] only had a
 fever. [Mother] also refused to sign releases to allow
 [DSS] and the hospital to develop a discharge plan.

 ...

 30. [Mr.] Flores testified that on [22 May] 2014, [Mother]
 stated to him that she had “taken care of everything”;
 that she would no longer work with [DSS]; that she
 would not sign releases to Copestone; that she would
 not enroll [S.B.] in a PRTF as recommended by [S.B.’s]
 discharge plan. [Mother] disclosed that she did not
 agree with the discharge plan and that she wanted
 [S.B.] to be grounded at home in order to reconnect
 with her family identity. [Mother] ultimately signed
 a referral to Eliada as a PRTF. However, this action
 was not in compliance with the discharge
 recommendation, in that the document signed was
 only a consent to place, and [Mother] knew that Eliada
 did not have a bed available for 30–40 days.

 ...

 35. The Court further finds that [Mother] testified to
 behaviors that she and the minor children suffered in
 the housing project, which are supported by medical
 records; however, said records recommended that the
 minor children [should] be assessed, especially [S.B.],
 which [Mother] failed to do. Additionally, [Mother]
 was not in compliance with discharge orders for
 Copestone, and did not protect [C.B.] from [S.B.’s]
 behaviors. [Mother’s] preferred treatment for [S.B.] to
 come home and be in the familial environment was
 directly in conflict with medical recommendations.

The trial court further found that C.B. and S.B. did “not receive proper care,

supervision or discipline” from Mother and that they “live[d] in an environment

 -5-
 IN RE: C.B. & S.B.

 Opinion of the Court

injurious to [each girl’s] welfare.” It also found that Mother was “unable to provide

for [S.B.’s] care or supervision and lack[ed] an appropriate alternative child care

arrangement” for her.

 C. Challenged Findings as to S.B.

 Mother challenges numerous findings in the adjudication order as to S.B.2

Finding of fact 16 in the adjudication order as to S.B. provides that

 16. [Ms.] Wallace’s investigation determined that [S.B.]
 has been hospitalized at Copestone several times,
 including four separate times during the
 investigation. [S.B.’s] behaviors are extremely
 negative and have directly limited her access to
 services. For example, [S.B.] is no longer allowed to
 ride the bus to school, and the local church bus refuses
 to allow her to ride.

Mother contends that “[t]he evidence [presented at the hearing showed] that [S.B.]

refused to ride the bus and that this is why [Mother] had to take [S.B.] to school and

pick her up in the afternoon.” Ms. Wallace and Mother did testify at the hearing that

S.B. did not want to ride the bus. However, Ms. Wallace also testified about an

incident in which S.B. “ran away from [a] church bus and climbed up a tree, [and]

that she had to be taken to the ER for evaluation.” Ms. Wallace also testified that

 2 Mother challenges finding of fact 12, which provides that “[t]he verified Juvenile Petition[s]
[were] entered into evidence without objection by any party.” Mother contends only that “[t]he record
does not show that the petition[s] [were] entered into evidence.” Although there were general
references to documents being admitted into evidence at the hearings, we agree with Mother to the
extent that it is not clear whether the verified petitions as to S.B. and C.B. were admitted into evidence
at the hearing. However, Mother provides no further argument on this issue and, therefore, we do not
believe it is conclusive as to her appeal.

 -6-
 IN RE: C.B. & S.B.

 Opinion of the Court

S.B. would run away from school, attack school personnel, and generally acted

“uncontrollable.” She confirmed that “those behaviors affected [S.B.’s] ability to ride

the school bus[.]” Even assuming Mother’s challenge regarding S.B. being “no longer

allowed to ride the [school] bus” is meritorious, the portion of finding of fact 16 that

“[S.B.’s] behaviors are extremely negative and have directly limited her access to

services” is supported by clear and convincing evidence. Mother does not challenge

the remainder of finding of fact 16. Therefore, all but the last sentence in finding of

fact 16 is binding on this Court. C.B., 180 N.C. App. at 223, 636 S.E.2d at 337;

Pittman, 149 N.C. App. at 764, 561 S.E.2d at 566.

 Findings of fact 17, 22, and 33 in the adjudication order as to S.B. provide that

 17. [Ms.] Wallace interviewed [Mother]. [Mother] denied
 calling [S.B.] names. [Mother] admitted that [S.B.]
 had been hospitalized several times due to [S.B.’s]
 behaviors. However, [Mother] minimized [S.B.’s]
 behaviors. She did agree to follow up with mental
 health services for [S.B.] However, [Mother]
 ultimately failed to cooperate with services
 recommended for [S.B.]

 ...

 22. While [Mother] initially agreed to follow up with
 [S.B.’s] medical health needs, it became clear through
 subsequent interviews and actions that [Mother]
 minimizes [S.B.’s] behaviors and does not accept that
 [S.B.’s] behaviors are rooted in mental health
 problems. [Mother] also believes that the hospital
 “reprogrammed” [S.B.] to turn . . . against [Mother].

 ...

 -7-
 IN RE: C.B. & S.B.

 Opinion of the Court

 33. After review of all the documentary evidence and the
 relevant testimony of the parties, the Court finds as
 fact the allegations in the Juvenile Petition and makes
 the following ultimate findings of fact. [S.B.] has been
 hospitalized due to psychiatric concerns no less than
 5 times in 4 months, and she is engaging in behaviors
 requiring the intervention of mental health services.
 [S.B.] was in Copestone in March of 2004 [sic], and
 displaying aggressive, assaultive, dangerous
 behaviors, and [Mother] did make efforts to get [S.B.]
 medical treatment; however, [Mother] failed to grasp
 the severity of [S.B.’s] mental health issues, and
 failure to do so placed [S.B.] at risk.

Mother challenges only the statements in findings of fact 17, 22, and 33 suggesting

Mother “minimize[d] [S.B.’s] behavior or fail[ed] to grasp the severity of it.” At the

hearing, Ms. Wallace testified that S.B. (1) regularly attacked other people, including

school personnel and a police officer; (2) ran away from home and school; and (3) had

to be hospitalized at Copestone multiple times. Ms. Wallace further testified that, in

her conversations with Mother, Mother (1) “didn't characterize [S.B.’s behaviors] as

severe[;]” (2) demonstrated that she did “not understand[ ] the severity of [S.B.’s]

mental health issues[;]” and (3) believed S.B.’s mental health issues could be

addressed at home without any outside “intervention[.]” Mr. Flores also testified that

Mother failed to demonstrate an understanding of the extent of S.B.’s mental health

needs, was even confused as to “why Copestone[, a psychiatric hospital,] was keeping

[S.B.] so long because [Mother believed S.B.] was only admitted . . . for having a

fever[,]” and that Mother’s plan upon S.B.’s discharge was to merely “bring [S.B.]

home[.]” Accordingly, the challenged statements in findings of fact 17, 22, and 33 are

 -8-
 IN RE: C.B. & S.B.

 Opinion of the Court

supported by clear and convincing evidence. Mother does not challenge the

remainder of findings of fact 17, 22, and 33. Therefore, all of those findings are

binding on this Court. C.B., 180 N.C. App. at 223, 636 S.E.2d at 337; Pittman, 149

N.C. App. at 764, 561 S.E.2d at 566.

 Finding of fact 20 in the adjudication order as to S.B. provides that

 20. [Ms.] Wallace’s investigation determined that [C.B.]
 was present during the incident at Ingle’s, specified
 above, and has been present during each incident that
 resulted in [S.B.] being involuntarily committed to
 Copestone. On this occasion, [C.B.] had to “run
 around Ingles” in an effort to find her sister, was
 worried about her, and expressed fear that [S.B.] was
 going to be hurt as a result of [S.B.’s] behaviors.
 [Mother] failed to protect [C.B.] from [S.B.’s]
 behaviors, and [Mother’s] solution was that everyone
 “just needed to step out”, and allow [Mother] to get
 [S.B.] grounded at home.

Mother challenges only the statement in finding of fact 20 that Mother “failed to

protect [C.B.] from [S.B.’s] behaviors” during the incident at Ingles because, Mother

contends, she was not present during the incident and, therefore, was unable to

“protect” C.B. at that time. Although we believe Mother likely takes too narrow a

view of what the trial court meant when it found that Mother “failed to protect [C.B.]

from [S.B.’s] behaviors,” even assuming Mother’s challenge is meritorious, the

remaining, unchallenged, portion of this finding is binding on this Court. C.B., 180

N.C. App. at 223, 636 S.E.2d at 337.

 -9-
 IN RE: C.B. & S.B.

 Opinion of the Court

 Findings of fact 23, 31, 32 and 34 in the adjudication order as to S.B. provide

that

 23. [Mother] refused to allow Intensive In Home Services
 to work with her family. [Mother] admitted to [Ms.]
 Wallace that she believes [S.B.’s] behaviors are
 making her and [S.B.’s] sister put their lives on hold.
 [Mother] is extremely defensive and rejects outside
 intervention into her family, despite the fact that
 [S.B.] remains hospitalized due to her extreme
 behaviors. [Mother] is unwilling or unable to
 understand [S.B.’s] needs, and refuses to make
 changes in her life to address [S.B.’s] needs. [Mother]
 does not have any emotional protective capacity and
 agitates [S.B.], making the situation more out of
 control.

 ...

 31. [Mr.] Flores testified that [Mother] stated many times
 her belief that [S.B.] suffered from seizures and that
 was the only reason that [S.B.] was hospitalized.
 [S.B.] was tested at Copestone for seizures and no
 seizure disorder was identified. [Mr.] Flores was able
 to find no medical record that supported the
 conclusion that [S.B.] suffered from [a] seizure
 disorder. [Mother] never asked [DSS] to secure a
 second medical opinion on this issue. Despite all of
 the information to the contrary, [Mother] continues to
 believe that [S.B.] suffers from [a] seizure disorder,
 rather than from mental health issues.

 32. [Mother] testified that she had signed all treatment
 plans for [S.B.], prior to [13 May] 2014, but that she
 believed that [DSS’s] treatment plans caused [S.B.] to
 have seizures, and that these treatment plans
 endangered her daughter. [Mother] believes that
 [S.B.] suffers from Post-Traumatic Stress Disorder
 (PTSD), due to a bullying incident that occurred at the
 family’s housing project, but that this issue could be

 - 10 -
 IN RE: C.B. & S.B.

 Opinion of the Court

 handled by her at home. [Mother] acknowledged that
 [C.B.] was present during the incidents of [S.B.’s]
 behaviors specified above, but had no concerns about
 exposing [C.B.] to [S.B.’s] behaviors.

 ...

 34. The Court finds that [Mother] testified that [S.B.’s]
 only problems were a fever and a seizure, which is not
 evidenced in the Copestone records. Treatment
 medical doctors had acknowledged that [Mother’s]
 presence with [S.B.] makes [S.B.’s] behaviors worse,
 and doctors felt there was a nexus between [Mother]
 and [S.B.’s] worsening behaviors. The doctors felt a
 PRTF placement was necessary to cut this connection.
 Throughout this case [DSS] has worked diligently
 with [Mother] to meet the needs of [S.B.] [Mother]
 refused intensive in-home treatment. [Mother] did
 sign some initial papers for Eliada, but not a release
 for [S.B.] to be placed there. [Mother] did state she
 and [C.B.] were being held hostage by [S.B.’s]
 behaviors, and [C.B.] was exposed to [S.B.’s]
 behaviors. [Mother] took no protective steps to keep
 [C.B.] from being exposed to [S.B.’s] behaviors, and
 when [Mother] was offered an opportunity to have
 [C.B.] evaluated, she refused.

Mother contends that the statements in findings of fact 23 and 34 suggesting that

Mother would not agree to intensive in-home services for S.B. are not supported by

the evidence. Ms. Wallace testified at the hearing that Mother consistently refused

to let S.B. receive intensive in-home services and instead insisted that S.B. be cared

for by Mother or receive less-intense, periodic outpatient services, which Ms. Wallace

testified did not “effectively treat [S.B.’s] mental health needs[,]” lasted only two

weeks, and ended when S.B. was readmitted to Copestone. Ms. Wallace further

 - 11 -
 IN RE: C.B. & S.B.

 Opinion of the Court

testified that, instead of Mother disagreeing with the potential efficacy of intensive

in-home services for S.B., Mother stated she refused to let S.B. receive intensive in-

home services because she did not want providers “coming to” her home and because

Mother “thought she could handle [S.B.’s mental health needs] at home” by herself.

Moreover, although Mother contends in her brief that she “was willing” to have S.B.

receive intensive in-home services by the time medical personnel felt S.B. needed

placement in a psychiatric residential treatment facility (“PRTF”), we find no

evidence from the adjudication hearing to support this contention. Therefore, the

challenged statements in findings of fact 23 and 34 are supported by clear and

convincing evidence.

 Mother also contends that statements in findings of fact 31, 32, and 34

suggesting that Mother believed S.B.’s behaviors were the result of fevers and

seizures are not supported by the evidence. However, Mr. Flores testified Mother

conveyed to him “her belief that [S.B.’s] only real issue was having a seizure

disorder[.]” Mother even testified that S.B. was admitted to Copestone only “because

[S.B] had a fever and her eyes rolled back in her head and she passed out and had an

episode.” Therefore, the challenged statements in findings of fact 31, 32, and 34 are

supported by clear and convincing evidence. Mother also does not contest the trial

court’s finding that medical personnel at Copestone could find no evidence that S.B.

suffered from seizures.

 - 12 -
 IN RE: C.B. & S.B.

 Opinion of the Court

 With regards the adjudications of S.B. as neglected and dependent, the

challenged statements in findings of fact 23, 31, 32 and 34 are supported by clear and

convincing evidence; Mother does not challenge the remainder of findings of fact 23,

31, 32 and 34.3 Therefore, they are binding on this Court. C.B., 180 N.C. App. at 223,

636 S.E.2d at 337; Pittman, 149 N.C. App. at 764, 561 S.E.2d at 566.

 Findings of fact 24 and 25 in the adjudication order as to S.B. provide that

 24. On [15 May] 2014, the case was substantiated and
 transferred to In Home [social worker Mr.] Flores.
 [Mr.] Flores met with [Mother] on [15 May] 2014.
 [Mother] refused to agree to any services, [and she]
 refused to follow up with any mental health services
 for [S.B.] [Mother] also refused to participate in a
 comprehensive clinical assessment, as she found that
 “offensive.” [Mother] did acknowledge that [Mr.]
 Flores had a “calming energy” and stated she would
 allow him to conduct home visits.

 25. [S.B.] was hospitalized in Copestone after being
 admitted on [14 May] 2014. [S.B.] has serious mental
 health needs that [Mother] refuses to ensure that
 those needs are met. [Mother] refuses to sign any
 releases or work with the hospital to plan for [S.B.’s]
 discharge. [S.B.] does not want to return to [Mother’s]
 home.

Mother contends that the statements in findings of fact 24 and 25 suggesting that

Mother “refused to participate in any services and would not agree to work with the

hospital on a discharge plan” are not supported by the evidence. As a preliminary

 3 However, Mother does challenge another part of finding of fact 32 with regard to C.B.’s
neglect adjudication, discussed infra.

 - 13 -
 IN RE: C.B. & S.B.

 Opinion of the Court

matter, findings of fact 26 and 27, which are not challenged by Mother, establish that

Mother “would not cooperate with the hospital or [DSS] to develop a discharge plan”

and in fact “refused to sign releases to allow [DSS] and the hospital to develop [any]

discharge plan.” See C.B., 180 N.C. App. at 223, 636 S.E.2d at 337. Moreover, Mr.

Flores testified at the hearing that Mother did, in fact, refuse to participate in S.B.’s

discharge planning because “she wasn’t in agreement with . . . the doctor’s

recommend[ed]” treatment plan, which – absent DSS filing the present action – could

have resulted in S.B. continuing to reside at Copestone psychiatric hospital

indefinitely.4 Accordingly, the challenged statements in findings of fact 24 and 25 are

supported by clear and convincing evidence. Mother does not challenge the

remainder of findings of fact 24 and 25. Therefore, they are binding on this Court.

C.B., 180 N.C. App. at 223, 636 S.E.2d at 337; Pittman, 149 N.C. App. at 764, 561

S.E.2d at 566.

 1. S.B.’s Neglect Adjudication

 Mother first challenges the trial court’s adjudication of S.B. as neglected. A

neglected juvenile is defined, in part, as one “who does not receive proper care,

supervision, or discipline from the juvenile's parent, guardian, custodian, or

caretaker; or who has been abandoned; or who is not provided necessary medical care;

or who is not provided necessary remedial care; or who lives in an environment

 4 Psychiatric hospitals are “the most intensive and restrictive type of [mental health] facility”
in the state. 10a N.C.A.C. 27g.6001.

 - 14 -
 IN RE: C.B. & S.B.

 Opinion of the Court

injurious to the juvenile's welfare[.]” N.C. Gen. Stat. § 7B-101(15) (2013). “[T]his

Court require[s] [that] there be some physical, mental, or emotional impairment of

the juvenile or a substantial risk of such impairment” as a consequence of the alleged

neglect. In re McLean, 135 N.C. App. 387, 390, 521 S.E.2d 121, 123 (1999) (citations,

quotation marks, and emphasis in original omitted).

 Findings of fact 16, 23, and 25, and finding of fact 18, which is not challenged

by Mother, show that S.B. had to be committed to Copestone five times in only four

months, that S.B. “has serious mental health needs[, and] that [Mother] refuses to

ensure that those needs are met.” Findings of fact 17, 22, 23, 31, 32, and 34, and

finding of fact 27, which is not challenged by Mother, show that, although Mother

“initially agreed to follow up with [S.B.’s] medical health needs, it became clear

through subsequent interviews and actions that [Mother] minimize[d] [S.B.’s]

behaviors and [did] not accept that [S.B.’s] behaviors are rooted in mental health

problems.” Findings of fact 31, 32, and 34, and finding of fact 27, which is not

challenged by Mother, specifically show that Mother believed S.B.’s extreme and

violent behavior was the result of fevers or seizures. Findings of fact 17, 22, and 23

also establish that Mother was “unwilling or unable to understand [S.B.’s] needs, . . .

refuse[d] to make changes in her life to address [S.B.’s] needs[,] . . . does not have

any emotional protective capacity[,] and agitates [S.B.], making the situation more

out of control.” Furthermore, findings of fact 16 and 20, and findings of fact 19 and

 - 15 -
 IN RE: C.B. & S.B.

 Opinion of the Court

21, which are not challenged by Mother, show that S.B. continued to have erratic and

violent behavior while in Mother’s custody and while she was not receiving

meaningful mental health services. Yet, findings of fact 20 and 23, and findings of

fact 18, 30, and 35, which are not challenged by Mother, show that Mother’s

“preferred treatment for [S.B. was for S.B.] to come home and be in the familial

environment[, which] was directly in conflict with medical recommendations.”

Findings of fact 24 and 25, and findings of fact 26 and 27, which are not challenged

by Mother, show that Mother refused to “cooperate with the hospital or [DSS] to

develop a discharge plan” for S.B. during a subsequent hospitalization at Copestone

and “refused to sign releases to allow [DSS] and the hospital to develop a discharge

plan.”

 The binding facts, discussed above, support the trial court’s ultimate

conclusion that S.B. was neglected. Contrary to Mother’s contention in her brief, the

present case was not brought merely because “[M]other and the hospital [had a

disagreement] concerning the next step in [S.B.’s] treatment.” Instead, the binding

findings of the trial court establish that (1) while S.B. was in Mother’s custody,

Mother continuously failed to obtain meaningful mental health services for S.B. that

could have prevented or mitigated S.B.’s need for repeated hospitalizations at

Copestone; (2) greatly minimized and denied the seriousness of S.B.’s condition; and

(3) even exacerbated it. Mother also obstructed the creation of any discharge plan for

 - 16 -
 IN RE: C.B. & S.B.

 Opinion of the Court

S.B. while S.B. was hospitalized at Copestone, and thereby continued to subject S.B.

to “the most intensive and restrictive type of [mental health] facility” in the state, 10a

N.C.A.C. 27g.6001, even though all of the evidence presented at the hearing indicated

that such continued placement would not have been medically “appropriate[.]”

 This Court is sensitive to the difficult and momentous decisions that parents

of children with severe mental illness must face. Indeed, we agree with the dissent

that it likely would be inappropriate for the State to utilize neglect proceedings to

resolve disagreements between parents and doctors over equally appropriate

treatment options. We further agree with the dissent that parents have a

“fundamental right . . . to make decisions concerning the care, custody, and control of

their children,” but respectfully note that this right is protected only “so long as a

parent adequately cares for his or her children[.]” Troxel v. Granville, 530 U.S. 57,

66–68, 147 L. Ed. 2d 49, 57–58 (2000); accord Petersen v. Rogers, 337 N.C. 397, 402,

445 S.E.2d 901, 904 (1994) (“[S]o long as certain minimum requirements of child care

are met, the interests of the child may be subordinated to the interests of other

children, or indeed even to the interests of the parents or guardians themselves.”).

“A parent's rights with respect to [his or] her child[ren] have thus never been

regarded as absolute, but rather are limited[,] . . . critically, [by] the child[rens’] own

complementary interest in preserving . . . [their] welfare and protection[.]” Troxel,

530 U.S. at 88, 147 L. Ed. 2d at 70 (Stevens, J., dissenting).

 - 17 -
 IN RE: C.B. & S.B.

 Opinion of the Court

 Indeed, our Courts have long held that constitutional “protection of the

parent's interest is not absolute [and] . . . ‘the rights of the parents are a counterpart

of the responsibilities they have assumed.’ ” Price v. Howard, 346 N.C. 68, 76, 484

S.E.2d 528, 533 (1997) (quoting Lehr v. Robertson, 463 U.S. 248, 257, 77 L. Ed. 2d

614, 624 (1983)). “[T]he constitutionally-protected paramount right of parents to

custody, care, and control of their children” does not extend to “neglect[ing] the

welfare of their children[.]” Petersen, 337 N.C. at 403–04, 445 S.E.2d at 905. At some

point, a parent’s unjustified unwillingness or inability to obtain meaningful medical

care for her child who is experiencing serious illness rises to the level of neglect, and

that is something the Constitution and the laws of this state will not protect. See

N.C.G.S. 7B-101(15) (specifically defining a neglected juvenile as one “who does not

receive proper care . . . from the juvenile's parent, . . . or who is not provided necessary

medical care; . . . or who lives in an environment injurious to the juvenile's

welfare[.]”); accord In re A.R., 227 N.C. App. 518, 520, 742 S.E.2d 629, 631 (2013)

(finding neglect, in part, where a child had “serious health issues including cysts on

his only kidney and an enlarged bladder” and the parents repeatedly failed to obtain

appropriate medical care for those conditions); cf. In re Huff, 140 N.C. App. 288, 300,

536 S.E.2d 838, 846 (2000) (holding that questions of “medical neglect” are

“appropriate considerations” in an action to terminate parental rights, even though

 - 18 -
 IN RE: C.B. & S.B.

 Opinion of the Court

“[s]uch findings . . . infring[e] on the [constitutionally-protected] autonomy of the

parents to some degree[.]”).

 In the present case, the findings of the trial court that are binding on appeal

support the trial court’s ultimate conclusion that S.B. was neglected. They establish

that Mother continuously failed to obtain meaningful mental health services for S.B.

while S.B. was in Mother’s custody, minimized and denied the seriousness of S.B.’s

condition, and even exacerbated it. This placed S.B. at a substantial risk of some

physical, mental, or emotional impairment. See McLean, 135 N.C. App. at 390, 521

S.E.2d at 123. Accordingly, we affirm the trial court’s adjudication of S.B. as

neglected.

 2. S.B.’s Dependency Adjudication

 Mother next challenges the trial court’s adjudication of S.B. as dependent. She

contends that the findings of fact and evidence do not support the trial court’s

conclusion of law that S.B. was a dependent juvenile. Specifically, she argues that

the findings of fact “reflect [only a] disagreement between . . . [M]other and the

hospital concerning the next step in [S.B.’s] treatment.”

 A juvenile may be adjudicated dependent when the juvenile’s parent, guardian

or custodian “is unable to provide for the juvenile’s care or supervision and lacks an

appropriate alternative child care arrangement.” N.C. Gen. Stat. § 7B-101(9) (2013).

When determining that a child is dependent “[u]nder this definition, the trial court

must address both (1) the parent’s ability to provide care or supervision, and (2) the

 - 19 -
 IN RE: C.B. & S.B.

 Opinion of the Court

availability to the parent of alternative child care arrangements.” In re P.M., 169

N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005). “Findings of fact addressing both

prongs must be made before a juvenile may be adjudicated as dependent, and the

court’s failure to make these findings will result in reversal of the [trial] court.” In re

B.M., 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007). However, it has been

“consistently held that in order for a parent to have an appropriate alternative child

care arrangement, the parent must have taken some action to identify viable

alternatives.” In re L.H., 210 N.C. App. 355, 364, 708 S.E.2d 191, 197 (2011).

 In the present case, the trial court made the ultimate finding that Mother was

“unable to provide for [S.B.’s] care or supervision and lack[ed] an appropriate

alternative child care arrangement.” The unchallenged and otherwise binding

findings of fact, discussed above, show that Mother continuously failed to obtain

meaningful mental health services for S.B. while S.B. was in Mother’s custody.

Mother also failed to identify any “viable” placement alternatives outside of

placement in her home at the adjudication hearing.5 See id. Although Mother argues

in her brief that she “was never given a chance to suggest an appropriate alternative

child care arrangement” for S.B., the findings of the trial court clearly establish that

 5 Mother testified at the adjudication hearing that she was also willing to place S.B. in a PRTF
called Eliada, but according to testimony from Mr. Flores, Eliada would not have had an opening for
S.B. for “[a]t least 30 to 40 days[.]”

 - 20 -
 IN RE: C.B. & S.B.

 Opinion of the Court

Mother refused to participate in, and even obstructed, S.B.’s discharge planning.

Accordingly, we affirm the trial court’s adjudication of S.B. as dependent.

 D. Challenged Findings as to C.B.’s Neglect Adjudication

 Mother challenges the trial court’s adjudication of C.B. as neglected. She

contends that the findings of fact and evidence do not support the trial court’s

conclusion of law that C.B. was a neglected juvenile. Specifically, she argues that the

trial court adjudicated C.B. a neglected juvenile “just because . . . Mother would not

agree to a comprehensive clinical assessment of [C.B.] and [because C.B.] saw some

of S.B.’s extreme behaviors.” (capitalization modified without brackets).

 As already discussed, a juvenile is neglected if the juvenile lives in an

environment injurious to the juvenile’s welfare or that poses a “substantial risk” to

the juvenile’s wellbeing. McLean, 135 N.C. App. at 390, 521 S.E.2d at 123; see

N.C.G.S. 7B-101(15). “In determining whether a juvenile is a neglected juvenile, it

[also] is relevant whether that juvenile lives in a home where another juvenile has

been subjected to . . . neglect[.]” Id.

 In addition to the factual challenges, discussed above, Mother specifically

challenges part of finding of fact 32 in the adjudication order as to C.B., stating that

Mother “had no concerns about exposing [C.B.] to [S.B.’s] behaviors[,]” and argues

that this finding “was not a fair reflection of the evidence.” However, during the

adjudication hearing, Ms. Wallace testified that Mother acknowledged she and C.B.

were “held hostage” by S.B.’s behaviors and that they “couldn’t live their lives because

 - 21 -
 IN RE: C.B. & S.B.

 Opinion of the Court

they had to be on guard with [S.B.]” Finding of fact 20 shows that C.B. had been

“present during each incident that resulted in [S.B.] being involuntarily committed

to Copestone.” This finding also recounts an incident where C.B. “had to ‘run around

[an] Ingles’ [while S.B. was having a ‘blow up’] in an effort to find her sister, was

worried about her, and expressed fear that [S.B.] was going to be hurt as a result of

[S.B.’s] behaviors[.]” According to Ms. Wallace, C.B. was exposed to numerous similar

incidents that made C.B. feel “scared” and alone. Many of these incidents involved

acts of violence by S.B. Yet, Mother was unwilling or unable to obtain meaningful

mental health services for S.B. while S.B. was at home with her and C.B., thereby

continuing to expose C.B. to S.B.’s behaviors unabated. Moreover, Mother testified

at the adjudication hearing that she was “waiting for [the issues with S.B.] to be over”

before seeking any kind of therapy or help for C.B. and that, generally, she “was not

concerned for” C.B.’s wellbeing as a result of S.B.’s “fits[.]” Accordingly, there was

sufficient clear and convincing evidence presented at the adjudication hearing to

support the contested portion of finding of fact 32 that Mother “had no concerns about

exposing [C.B.] to [S.B.’s] behaviors.” Therefore, this finding is binding on appeal.

See C.B., 180 N.C. App. at 223, 636 S.E.2d at 337; Pittman, 149 N.C. App. at 764, 561

S.E.2d at 566.

 Mother may be correct that “the sibling of [a] child with mental health issues

will be exposed to things that a parent wishes the sibling did not have to experience”

 - 22 -
 IN RE: C.B. & S.B.

 Opinion of the Court

and that it would pose an “impossible standard” to “expect a parent to anticipate

when and where the problems will arise[.]” Again, this Court is sensitive to the

innumerable challenges that parents of children with severe mental illness must face,

especially when siblings are involved. However, in the present case, and

notwithstanding whether Mother was willing to have C.B. undergo a comprehensive

clinical assessment, all of the unchallenged or otherwise binding findings of the trial

court support the trial court’s ultimate conclusion that C.B. was neglected. Mother

(1) allowed C.B. to be continually exposed to S.B.’s erratic, troubling, and violent

behavior; (2) failed to obtain meaningful medical services for S.B. while S.B. was in

her custody that could have mitigated that behavior; and (3) showed no concern for

the effect this might have on C.B. Accordingly, we affirm the trial court’s adjudication

of C.B. as neglected.

 III. Mother’s Claim of Ineffective Assistance of Counsel

 Mother’s final contention is that she received ineffective assistance of counsel

“because her attorney did not review [S.B.’s] medical records” from Copestone or

subpoena the hospital psychiatrist and social worker during the adjudication hearing.

(capitalization modified without brackets).

 “[D]ecisions such as which witnesses to call, [or] whether and how to conduct

examinations . . . are strategic and tactical decisions that are within the exclusive

province of the attorney. Trial counsel are necessarily given wide latitude in these

matters.” State v. Rhue, 150 N.C. App. 280, 290, 563 S.E.2d 72, 79 (2002) (citation

 - 23 -
 IN RE: C.B. & S.B.

 Opinion of the Court

and quotation marks omitted). To prevail upon a claim that counsel’s assistance was

ineffective, a parent must show that: (1) counsel’s performance was deficient and (2)

the deficient performance was so serious as to deprive the parent of a fair hearing.

In re S.N.W., 204 N.C. App. 556, 559, 698 S.E.2d 76, 78 (2010). The client must show

that “counsel's conduct fell below an objective standard of reasonableness . . . [and

that had] counsel [not] made [the alleged] error [in question], even [if it was] an

unreasonable error, . . . there is a reasonable probability . . . there would have been a

different result in the proceedings.” State v. Braswell, 312 N.C. 553, 561–63, 324

S.E.2d 241, 248 (1985). “[T]he burden to show that counsel's performance fell short

of the required standard is a heavy one for [the client] to bear.” State v. Fletcher, 354

N.C. 455, 482, 555 S.E.2d 534, 551 (2001).

 Mother has not carried that burden. As a preliminary matter, Mother

acknowledges in her brief that S.B.’s medical records from Copestone were entered

into evidence and that the trial court reviewed S.B.’s medical records in camera for

about two hours.6 Mother does take issue with DSS’s characterization of S.B. during

the adjudication hearing as having “severe mental health issues,” and she contends

the medical records would have shown that S.B.’s extreme behavior emanated instead

from “psychosocial [issues,] . . . caused by the relationship with her mother.”

Assuming Mother is correct, this would seem to hurt, rather than help, Mother’s

 6 S.B.’s medical records from Copestone have been included in the record on appeal.

 - 24 -
 IN RE: C.B. & S.B.

 Opinion of the Court

position that S.B. was not living in an environment injurious to her welfare while in

Mother’s custody.

 Mother also contends that the medical records would have informed Mother’s

testimony and helped explain the hospital’s reasoning behind its actions and

treatment decisions. However, this does not get at the heart of the allegations

pertaining to S.B. in her neglect and dependency petition – that S.B. was at risk

because Mother was unwilling or unable to ensure that S.B. received medically

necessary mental health services. Accordingly, we are unable to say “there is a

reasonable probability . . . there would have been a different result in the proceedings”

had counsel fully reviewed and elicited testimony on the contents of S.B.’s medical

records at the adjudication hearing. Braswell, 312 N.C. at 563, 324 S.E.2d at 248.

 Moreover, even assuming arguendo that counsel's performance was deficient

as Mother claims, and that it “fell below an objective standard of reasonableness” as

defined by Braswell, 312 N.C. 561–62, 324 S.E.2d at 248, DSS presented

“overwhelming” evidence to support the adjudications of S.B., and Mother does not

contend that counsel’s representation was otherwise not “vigorous and zealous.” See

In re Dj.L., 184 N.C. App. 76, 86, 646 S.E.2d 134, 141 (2007) (finding no ineffective

assistance of counsel where, (1) assuming arguendo, “counsel failed to make proper

objections to testimony [during a termination of parental rights hearing;] . . . failed

to develop defenses to the grounds alleged for termination; and . . . did not subpoena

 - 25 -
 IN RE: C.B. & S.B.

 Opinion of the Court

witnesses” the parent felt were important to her case; (2) “DSS presented

overwhelming evidence to support at least one ground for termination of respondent's

parental rights[;]” and (3) “[c]ounsel's representation, while not perfect, was vigorous

and zealous.”). Accordingly, Mother was not deprived of a fair hearing, see id., and

the adjudication orders of the trial court are affirmed. Mother does not directly

challenge the disposition orders on appeal.

 AFFIRMED.

 Judge STEPHENS concurs.

 Judge TYSON dissents with separate opinion.

 - 26 -
 No. COA15-724 – In re C.B. & S.B.

 Tyson, Judge, dissenting.

 The majority’s opinion affirms the trial court’s adjudication that both S.B. and

C.B. are neglected juveniles. The trial court’s findings of fact do not support this

conclusion of law. The majority’s opinion also holds Mother has failed to carry her

burden to show she received ineffective assistance of counsel. Prior precedents guide

this Court not to make such a factual determination based on the paucity of the record

before us. I respectfully dissent.

 I. Standard of Review

 This Court reviews a trial court’s adjudication of neglect to determine: “(1)

whether the findings of fact are supported by clear and convincing evidence, and (2)

whether the legal conclusions are supported by the findings of fact[.]” In re Gleisner,

141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations and internal quotation

marks omitted). We review the trial court’s conclusion that a juvenile is abused,

neglected, or dependent de novo on appeal. In re N.G., 186 N.C. App. 1, 13, 650 S.E.2d

45, 53 (2007) (citations and internal quotation marks omitted), aff’d per curiam, 362

N.C. 229, 657 S.E.2d 355 (2008).

 II. Adjudication of Neglect

 Mother argues the trial court erred by finding S.B. and C.B. are neglected

juveniles. She contends the trial court’s findings of fact are not supported by clear,

cogent, and convincing evidence. The majority’s opinion states “[t]he binding facts . .

. support the trial court’s ultimate conclusion that S.B. was neglected.” I disagree.
 IN RE C.B. & S.B.

 TYSON, J., dissenting

 N.C. Gen. Stat § 7B-101(15) defines a “neglected juvenile” as:

 [a] juvenile who does not receive proper care, supervision,
 or discipline from the juvenile’s parent, guardian,
 custodian, or caretaker; . . . or who is not provided
 necessary medical care; or who is not provided necessary
 remedial care; or who lives in an environment injurious to
 the juvenile’s welfare . . . . In determining whether a
 juvenile is a neglected juvenile, it is relevant whether that
 juvenile lives in a home where . . . another juvenile has
 been subjected to abuse or neglect by an adult who
 regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15) (2013).

 Our Supreme Court has recognized “not every act of negligence on the part of

parents . . . constitutes ‘neglect’ under the law and results in a ‘neglected juvenile.’”

In re Stumbo, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (holding an anonymous

call reporting an unsupervised, naked two-year-old in the driveway, without more,

does not constitute neglect as intended by the legislature). The determination of

neglect is a fact-specific inquiry. A parent’s conduct must be reviewed on a case-by-

case basis, taking into consideration the totality of the circumstances. Speagle v.

Seitz, 354 N.C. 525, 531, 557 S.E.2d 83, 86 (2001), cert. denied, 536 U.S. 923, 153 L.

Ed. 2d 778 (2002).

 The trial court must find “some physical, mental, or emotional impairment of

the juvenile or a substantial risk of such impairment as a consequence of the failure

to provide proper care, supervision, or discipline” in order to adjudicate a juvenile as

neglected. In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993)

 2
 IN RE C.B. & S.B.

 TYSON, J., dissenting

(citations and internal quotation marks omitted). Also, when determining whether a

juvenile is neglected, “the trial judge may consider a parent’s complete failure to

provide the personal contact, love, and affection that exists in the parental

relationship.” In re Yocum, 158 N.C. App. 198, 204, 580 S.E.2d 399, 403 (citation and

quotation marks omitted), aff’d per curiam, 357 N.C. 568, 597 S.E.2d 674 (2003).

 A. S.B.’s Adjudication of Neglect

 No allegations or evidence offered by DSS tend to show Mother is unfit or has

abused either of her daughters, abuses drugs or alcohol, deprived them of financial

support, transportation, food, clothing, shelter, medical care, educational

opportunities, abandoned them by not giving her time and resources, or failed to show

parental love, comfort, care, or discipline. What is before us is a disagreement

between the daughters’ mother and a doctor and social worker over alternative

recommendations of preferred therapies and treatment to address S.B.’s conduct.

 N.C. Gen. Stat. § 7B-101(15) is not intended and cannot be used by DSS to gain

a corrosive leverage over a parent’s disagreements with alternative treatments and

therapies for her child. Such an application erodes a parent’s “fundamental right . .

. to make decisions concerning the care, custody, and control of their children.” Troxel

v. Granville, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000) (citations omitted). The facts

here are no different than a parent who refuses a doctor’s or counselor’s

recommendation to prescribe and administer Ritalin, a psychotropic drug, to her

 3
 IN RE C.B. & S.B.

 TYSON, J., dissenting

child, or a parent who refuses to allow blood transfusions, an organ transplant, or

other invasive procedures to be performed or administered to her child without

consent.

 Reasonable people may disagree over the best course of treatment or conduct

to follow. When that occurs, the fundamental rights and decision of the parent prevail

over the recommendations of the non-parent and the State. The fact that the parent

disagrees with the doctor, counselor, or social worker is not neglect. The parent’s

decision is legally and constitutionally entitled to support, deference and respect by

the State and its actors. In the end, in the absence of any showing that the parent is

unfit or refusing to allow emergency, life-saving treatment, the parent’s final decision

over the choices among alternative treatments and therapies to help her child trumps

those favored by DSS. Id.

 The “parental liberty interest ‘is perhaps the oldest of the fundamental liberty

interests’ the United States Supreme Court has recognized.” Owenby v. Young, 357

N.C. 142, 144, 579 S.E.2d 264, 266 (2003) (quoting Troxel, 530 U.S. at 66, 147 L. Ed.

2d at 57). The Supreme Court of the United States held this liberty interest must be

given great deference, stating:

 so long as a parent adequately cares for his or her children
 (i.e., is fit), there will normally be no reason for the State to
 inject itself into the private realm of the family to further
 question the ability of that parent to make the best
 decisions concerning the rearing of that parent’s children.

Troxel, 530 U.S. at 68-69, 147 L. Ed. 2d at 58 (citation omitted).

 4
 IN RE C.B. & S.B.

 TYSON, J., dissenting

 Our Supreme Court also recognized the importance of this fundamental liberty

interest in Owenby v. Young, 357 N.C. at 145, 579 S.E.2d at 266.

 We acknowledged the importance of this liberty interest
 nearly a decade ago when this Court held: absent a finding
 that parents (i) are unfit or (ii) have neglected the welfare
 of their children, the constitutionally protected paramount
 right of parents to custody, care, and control of their
 children must prevail. The protected liberty interest
 complements the responsibilities the parent has assumed
 and is based on a presumption that he or she will act in the
 best interest of the child.

Id. (citations and internal quotation marks omitted). See also Peterson v. Rogers, 337

N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994); Price v. Howard, 346 N.C. 68, 79, 484

S.E.2d 528, 534 (1997).

 Here, Mother is informed and well-aware of S.B.’s mental health needs, and is

exercising her constitutionally protected right to “custody, care, and control” of her

children. Owenby, 357 N.C. at 145, 579 S.E.2d at 266. The record reflects Mother’s

prevailing right to prefer S.B.’s “issues [to] be handled at home[.]” Mother’s

preference for in-home treatment for S.B. appears to be a result of her “belie[f] that

the hospital ‘reprogrammed’ [S.B.] to turn against” Mother.

 Mother has taken S.B. to Copestone each time she required hospitalization.

This evidence of Mother clearly responding to the dire needs of her severely mentally

ill child must not be overlooked. Mother also recognized SW Flores had a “calming

energy” around S.B., and allowed him to conduct home visits. Mother declined to

participate in a comprehensive clinical assessment, because she found it “offensive.”

 5
 IN RE C.B. & S.B.

 TYSON, J., dissenting

Mother has also expressed concern that “she believed that the Department’s

treatment plans caused [S.B.] to have seizures, and that these treatment plans

endangered her daughter.”

 Mother’s actions and choices regarding the “custody, care, and control” of her

children is a utilization of her “protected liberty interest.” Id. The fact that Mother’s

choices for S.B.’s care differ from the suggestions from S.B.’s medical providers cannot

diminish the presumption that she is acting in the best interest of her children. The

record certainly does not lend any support to a finding that Mother is unfit or neglects

the welfare of her children. Id. This Court sets a dangerous precedent if it allows a

difference of opinion regarding mental health recommendations to erode or supplant

this historic and fundamental liberty interest for parents to make critical and binding

decisions over the care of their children.

 The majority opinion’s assumption that the trial court’s findings of fact

“support the trial court’s ultimate conclusion that S.B. [and C.B. were] neglected” is

error and should be reversed. These findings are not sufficient to defeat the

paramount presumption of “the right of parents to establish a home and to direct the

upbringing and education of their children.” Owenby, 357 N.C. at 144, 579 S.E.2d at

266. See Meyer v. Nebraska, 262 U.S. 390, 399-400, 67 L. Ed. 2d 1042, 1045-46 (1923)

(noting the Fourteenth Amendment’s guarantee against deprivation of life, liberty or

 6
 IN RE C.B. & S.B.

 TYSON, J., dissenting

property without due process of the law includes an individual’s right to establish a

home and bring up children).

 B. C.B.’s Adjudication of Neglect

 The majority’s opinion concludes the trial court properly adjudicated C.B. and

S.B. as neglected juveniles. This conclusion is based on the notion that “Mother was

unwilling or unable to obtain meaningful mental health services for S.B. while S.B.

was at home with her and C.B., thereby continuing to expose C.B. to S.B.’s behaviors

unabated.”

 The fact that a sibling lives in a family home with a special needs child does

not constitute “an environment injurious to the juvenile’s welfare[.]” N.C. Gen. Stat.

§ 7B-101(15). The lives of any parent or sibling raising, caring for, and living in a

home with a special needs child or other family member will undoubtedly be impacted

by, and in many cases severely impacted by, the inordinate amount of time, resources

and familial emotions expended for the care and upbringing of a family member with

special needs. While such home environments may be challenging and cause siblings

to carry these experiences into their adult lives, it is a gross abuse for DSS to assert

that being exposed to and helping care for a special needs sibling supports either an

allegation or an adjudication of neglect.

 The trial court’s findings of fact show Mother disagrees with the alternative

treatment recommendations for S.B. Mother has a fundamental and constitutionally

 7
 IN RE C.B. & S.B.

 TYSON, J., dissenting

protected right to remain at the helm of rearing and caring for her children. Mother

should not be chastised and penalized for exercising her “constitutionally protected

paramount right . . . to custody, care, and control of [her] children” by disagreeing

with alternative treatment recommendations. Owenby, 357 N.C. at 145, 579 S.E.2d

at 266. The clear, cogent, and convincing evidence before this Court does not support

a conclusion that either S.B. or C.B. are neglected juveniles. In the absence of any

allegation or evidence that Mother is unfit, DSS cannot use the special needs of one

child to assert a sibling is neglected by sharing the same home.

 III. Ineffective Assistance of Counsel

 Mother argues the trial court’s order should also be vacated because she was

provided ineffective assistance of counsel. Mother contends her attorney’s failure to

“review [S.B.’s] medical records” or subpoena the hospital psychiatrist and social

worker during the adjudication amounts to ineffective and deficient representation

and resulted in severe prejudice to her. Whether or not this is correct cannot be

determined from the record before us.

 The majority’s opinion concludes Mother has failed to carry her burden to

“show that counsel’s performance fell short of the required standard[.]” State v.

Fletcher, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), cert. denied, 537 U.S. 846,

154 L. Ed. 2d 73 (2002). I disagree.

 It is well established that ineffective assistance of counsel
 claims brought on direct review will be decided on the

 8
 IN RE C.B. & S.B.

 TYSON, J., dissenting

 merits when the cold record reveals that no further
 investigation is required, i.e., claims that may be developed
 and argued without such ancillary procedures as the
 appointment of investigators or an evidentiary hearing.
 Thus, when this Court reviews ineffective assistance of
 counsel claims on direct appeal and determines that they
 have been brought prematurely, we dismiss those claims
 without prejudice, allowing [the party] to bring them
 pursuant to a subsequent motion for appropriate relief in
 the trial court.

State v. Thompson, 359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004) (citations and

internal quotation marks omitted), cert. denied, 546 U.S. 830, 163 L. Ed. 2d 80 (2005).

 On the record before us, this Court can only speculate whether counsel for

Mother’s failure to review S.B.’s medical records and subpoena relevant witnesses to

testify at the hearing “fell below an objective standard of reasonableness.” State v.

Braswell, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985) (citation omitted). In

accordance with established precedents, I vote to remand this issue to the trial court

for additional hearing, evidence, and findings of fact to further develop the record on

this issue.

 IV. Conclusion

 The trial court’s findings of fact do not support its ultimate conclusion that S.B.

and C.B. are neglected juveniles. The record clearly shows Mother repeatedly sought

medical treatment for S.B. when necessary. Mother’s authority and decision to

disagree with the recommendations of some of the treatment providers and the

State’s actors is a valid and protected exercise of her parental rights. Her decisions

 9
 IN RE C.B. & S.B.

 TYSON, J., dissenting

are constitutionally protected and insufficient to support an adjudication of neglect.

Owenby, 357 N.C. at 145, 579 S.E.2d at 266.

 Having S.B.’s sibling, C.B., present in the home during the daily living and

sharing in S.B.’s struggles does not constitute neglect. DSS cannot lawfully assert

these allegations are sufficient to usurp Mother’s constitutionally protected rights to

make final decisions over “the custody, care, and control of [her] children[,]” which

must be respected and supported by the State. Id. It is preposterous for DSS to assert

or for the trial court to find that C.B. is neglected merely by living in the same home

with her twin sister, who has special needs.

 This case and S.B.’s needs are not a game over who wins and who loses. It

concerns who is the ultimate decision-maker when choosing among alternative

treatments for S.B.’s care. The Constitution and the Supreme Court of the United

States, and the Supreme Court of North Carolina have repeatedly answered this

issue in favor of the fit parent.

 The record before us is insufficient to establish whether Mother was saddled

with ineffective assistance of counsel at the adjudication and disposition. I vote to

reverse the trial court’s adjudications of neglect and to remand for hearing on the

ineffective assistance of counsel claim. I respectfully dissent.

 10